## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DANIEL MCRITCHIE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GLOBAL TETRAHEDRON, LLC,<br><br>Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Daniel McRitchie ("Plaintiff"), by and through his attorneys, brings this action on behalf of himself and all others similarly situated. Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

### NATURE OF THE ACTION

1. This is a class action suit brought against Global Tetrahedron, LLC ("Defendant") for violating the Video Privacy Protection Act ("VPPA").

2. Defendant owns and operates its website theonion.com (the "Website" or "The Onion"), a satirical news website featuring articles and videos of satirical news events. Consumers access the site through their browsers at theonion.com. Consumers looking to have a good laugh can subscribe to Defendant's newsletter to stay up to date with the latest, fake, "breaking national, international, and local news events."[1] Like a "true" source of breaking news, Defendant provides users with pre-recorded "news coverage" videos via its Website.

3. Defendant has installed a "tracking pixel" on its Website, which hosts the videos for streaming. This tracking pixel surreptitiously sends consumers' viewing activities to third-

---

[1] https://theonion.com/about-us/

party providers like Meta Platforms, Inc. ("Meta") without consent, in violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C § 2710, *et seq.*

4.     Congress has recognized that "films are the intellectual vitamins that fuel the growth of individual thought." S. Rep. No. 100-599, at *7 (Oct. 21, 1988) (citing Senate Judiciary Subcommittee on Technology and Law, Hearing Tr. at 10 (Aug. 3, 1988)). As the Committee on the Judiciary explained when considering the VPPA, "[Privacy] is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom. We want to be left alone." *Id*. at *6. The VPPA was meant to give consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." *Id*. at *8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id*.

5.     Specifically, Defendant violated the VPPA by knowingly disclosing the personally identifiable information ("PII") of Plaintiff and the class members to Meta without their consent. To do so, behind the scenes of its videos, Defendant installed computer code on its Website called the "Meta Pixel," which—unbeknownst to Plaintiff and the members of the Class—tracks and records Plaintiff's and the Class members' private video consumption and discloses it to Meta without their consent. Meta, in turn, uses Plaintiff's and the Class members' video consumption habits to build profiles on consumers and deliver targeted advertisements to them, among other activities.[2]

**THE PARTIES**

6.     Plaintiff Daniel McRitchie is a citizen of New York who resides in Rhinebeck, NY. Plaintiff subscribed to Defendant's newsletter via the Website and is therefore a subscriber under the meaning of the statues referenced herein (as fully explained below). Plaintiff became a subscriber to The Onion sometime in or around 2024. Plaintiff, on various occasions, has used

---

[2] Notably, the Meta Pixel works in conjunction with its Conversion API tool and, as a result, Defendant transmits one copy of its digital subscribers' viewing information directly from its web server to Meta's web servers. Additional copies of this information are communicated through the use of cookies.

the Website to watch Defendant's pre-recorded videos.  Plaintiff accesses the Website on the same browser he uses to access his Facebook account, which he created using his real name.

7.     Defendant Global Tetrahedron, LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois.  Defendant owns and operates theonion.com, which is used throughout New York and the United States.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).  This Court further has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, there are more than 100 members of the Class and California Subclass, and there is minimal diversity.

9.     This court has specific personal jurisdiction over Defendant because Defendant's principal place of business is in this district.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this district.

## FACTUAL ALLEGATIONS

**A.     History And Overview Of The VPPA**

11.     The origins of the VPPA began with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record.  With an eye toward the digital future, Congress responded by passing the VPPA.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home.  In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

12.      Accordingly, the VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).  The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

13.      Individuals who are "aggrieved" by a violation of the VPPA may bring an action for "not less than liquidated damages" of $2,500 per violation, in addition to other remedies.  18 U.S.C. §§ 2710(c)(1)-(2).

**B.      Overview Of The Meta Pixel**

14.      Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[3]  Facebook describes itself as a "real identity platform,"[4] meaning users are allowed only one account and are encouraged to share "the name they go by in everyday life."[5]  To that end, when creating an account, users provide their first and last name, along with their birthday, gender, and phone number or email address.[6]

15.      Meta owns Facebook.com and generates revenue by selling advertising space on its website, and other applications it owns, like Instagram.[7]

---

[3] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO! (July 28, 2021), available https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html (last accessed June 21, 2024).

[4] Sam Schechner & Jeff Horowitz, *How Many Users Does Facebook Have? The Company Struggles to Figure it Out*, Wall St. J. (Oct. 21, 2021) available https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701 (last accessed June 21, 2024).

[5] META, *Community Standards, Part IV Integrity and Authenticity,* available https://www.facebook.com/communitystandards/integrity_authenticity (last accessed June 21, 2024).

[6] META, *Sign Up*, available https://www.facebook.com/ (last accessed June 21, 2024).

[7] Mike Isaac, *Facebook Profit Surges 101 Percent on Strong Ad Sales*, N.Y. TIMES (July 28,

16.    Meta sells advertising space by highlighting its ability to target users.[8]  Meta can target users effectively because it surveils user activity both on and off its site.[9]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "location," and "demographics."[10]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[11]

17.    Businesses can also build "Custom Audiences."[12]  Custom audiences enable businesses to reach "people who already know [their] business," because Meta can track whether they're loyal customers or people who have used a particular business' app or visited their website.[13]  Businesses can use Custom Audiences to target existing customers directly, or they can use it to build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behaviors from your source audience to find new people who share similar qualities."[14]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta.  They can do so through two mechanisms: by manually uploading

2021) available https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html (last accessed June 21, 2024).

[8] META, *Why Advertise on Facebook, Instagram and other Meta Technologies*, available https://www.facebook.com/business/help/205029060038706 (last accessed June 21, 2024).

[9] META, *About Meta Pixel*, available https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last accessed June 21, 2024).

[10] META, *Audience Ad Targeting*, available https://www.facebook.com/business/ads/ad-targeting (last accessed June 21, 2024).

[11] META, *Easier, More Effective Ways to Reach the Right People on Facebook*, available https://www.facebook.com/business/news/Core-Audiences (last accessed June 21, 2024).

[12] META, *Create a website custom audience*, available https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last accessed June 21, 2024).

[13] META, *Audience ad targeting*, available https://en-gb.facebook.com/business/ads/ad-targeting (last accessed June 21, 2024).

[14] META, *About Lookalike Audiences*, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last accessed June 21, 2024).

contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[15]  One such Business Tool is the Meta Pixel.

18.     The Meta Pixel is a piece of code that businesses, like Defendant, can integrate into its Website.  Once activated, the Meta Pixel "allows [the site] to track visitor activity on [their] website."[16] When the Meta Pixel captures an action, it sends a record to Facebook.  Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

19.     Businesses control what actions—or, as Meta calls it, "events"—the Meta Pixel will collect on that business's site, including the website's metadata, along with what pages a consumer views.[17]  Businesses can also configure the Meta Pixel to track other events.  Meta offers a menu of "standard events" from which businesses can choose to track, including what content a consumer views or purchases.[18]  An advertiser can also create their own tracking parameters by building a "custom event."[19]

20.     Likewise, businesses using the pixel on their website control how the Meta Pixel identifies consumers.  The Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[20]  The HTTP Headers collect "IP addresses, information about the

---

[15] META, *Create a Customer List Custom Audience*, available https://www.facebook.com/business/help/170456843145568?id=2469097953376494; *See Also* Meta, *Create a Website Custom Audience*, available https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last accessed June 21, 2024).

[16] META, *Meta Pixel*, available https://developers.facebook.com/docs/meta-pixel/ (last accessed June 21, 2024).

[17] *See* META, *Meta Pixel, Accurate Event Tracking, Advanced*, available https://developers.facebook.com/docs/facebook-pixel/advanced/; See also Facebook, Best Practices for Facebook Pixel Setup, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last accessed June 21, 2024).

[18] META, *Specifications for Facebook Pixel Standard Events*, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last accessed June 21, 2024).

[19] META, *About Standard and Custom Website Events*, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last accessed June 21, 2024).

[20] META, *Meta Pixel*, https://developers.facebook.com/docs/facebook-pixel/ (last accessed June 21, 2024).

web browser, page location, document referrer and persons using the website."[21]  Pixel-specific Data includes "the Pixel ID and Cookie."[22]

21.     The Meta Pixel, like website cookies generally, attaches to the browser that the user uses to access their Facebook account.  That cookie then follows the user's web activity occurring within that same browser.  For example, if the user accesses Facebook.com through their Safari browser, then moves to theonion.com after leaving Facebook, the Meta Pixel will continue to track that user's activity on that browser.

**C.     Defendant is a Video Tape Service Provider**

22.     Defendant owns and operates The Onion, a satirical news website that features pre-recorded, on-demand news videos for streaming.

23.     Consumers can subscribe to The Onion by providing their email in the newsletter sign-up portion of the Website.  By subscribing, consumers receive daily email alerts on new content published on the Website, including pre-recorded videos.

24.     On the Website, Defendant offers a designated webpage for its pre-recorded video content.  *See* Figure 1.

**Figure 1**



---

[21] *Id*.
[22] *Id*.

25.     Therefore, Defendant delivers pre-recorded videos to consumers via the Website, making it a video tape service provider under the VPPA.

**D.    The Onion and the Meta Pixel**

26.     Unbeknownst to Defendant's consumers, Defendant knowingly discloses users' video viewing histories to Meta.

27.     Defendant has chosen to implement or embed the Meta Pixel on its Website, which transmits events to Meta.  When a consumer watches any of Defendant's pre-recorded videos on the Website, the Meta Pixel first generates a PageView event that discloses a webpage's Universal Resource Locator ("URL") containing the video title the consumer has requested and viewed.  That information is disclosed to Meta as shown in Figures 2 and 3.

28.     In Figures 2 and 3, for example, if a user watches a video on the Website, the title of the video appears in the URL.  That URL is then captured by the Meta Pixel and disclosed to Meta.  In the case of the video in Figures 2 and 3 below, Meta receives the title of the video, *Study: More Americans Buying Firearms To Defend Selves From Toddlers Who Found Their Guns*, via the URL "https%3A%2F%2Ftheonion.com%2Fstudy-more-americans-buying-firearms-to-defend-selves-from-toddlers-who-found-their-guns."

**Figure 2**



**Figure 3**



29.     When Defendant discloses the video titles of the videos consumers view on The Onion to Meta, Meta also receives a consumer's unencrypted Facebook ID along with the video title of the video the consumer is watching.  Meta obtains this Facebook ID through its c_user cookie.

30.     The c_user cookie is personally identifiable information because it contains a consumer's unencrypted Facebook ID.  A Facebook ID allows anybody—not just Facebook—to identify the individual The Onion subscriber with a Facebook account.  If one types www.facebook.com/[facebook ID] into a web browser, it will load the individual's Facebook page.

31.     For example, Figure 4 below shows the c_user cookie containing the Facebook ID being disclosed to Meta along with the information about the video the user is watching on the Website.

**Figure 4**

32. Any ordinary person can access all the data disclosed to Meta in a few easy steps. For example, one can simply ask ChatGPT or any other large language model for a simple how-to guide. *See* Figure 5, below.

**Figure 5**



33. ChatGPT can even offer to help you walk through what Figure 4 says. *See* Figure 6, next page.

**Figure 6**



**Figure 7**



**Figure 8**



34. As ChatGPT explains, "no special tools [are] required." Figure 5. The ordinary person has the capability to discover all this information for himself or herself and need not undertake any unforeseen detective work to collect other information from other sources.

13

Indeed, speaking about the Meta pixel, Santa Clara University law professor Eric Goldman recently quipped that with "a few quick Google searches, an ordinary person would be able to read this URL like a champ."[23]  All it takes is for them to be "intellectually curious, and … motivated to do simple searches."[24]

35.     The Meta Pixel transmits additional cookies to Meta.

36.     The fr cookie, active on Defendant's site, contains, at least, an encrypted Facebook ID and browser identifier.[25]  Facebook, at a minimum, uses the fr cookie to identify particular users.[26]

37.     Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.  Facebook uses this for targeted advertising.

38.     The Meta Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—i.e. theonion.com.[27]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook.[28]

39.     Meta, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

40.     Through the Meta Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, what The Onion subscribers are requesting and watching for entertainment.

---

[23] TECHNOLOGY & MARKETING LAW BLOG, Meta Pixels Case Dismissed by Second Circuit–Solomon v. Triller (May 5, 2025), https://blog.ericgoldman.org/archives/2025/05/meta-pixels-case-dismissed-by-second-circuit-solomon-v-triller.htm.

[24] *Id*.

[25] DATA PROTECTION COMMISSIONER, Facebook Ireland Ltd, Report of Re-Audit (Sept. 21, 2012), available http://www.europe-v-facebook.org/ODPC_Review.pdf

[26] META, Cookies & Other Storage Technologies, https://www.facebook.com/policy/cookies/ (last accessed June 27, 2024).

[27] PC MAG, First Party Cookie, available https://www.pcmag.com/encyclopedia/term/first-party-cookie (last accessed June 27, 2024).

[28] PC MAG, First Party Cookie, available https://www.pcmag.com/encyclopedia/term/first-party-cookie (last accessed June 27, 2024).

41.     By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data for videos, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

42.     Defendant disclosed Plaintiff's video viewing behavior as he viewed videos on the Website, alongside his Facebook ID, as described in the examples above.

## CLASS ALLEGATIONS

43.     **The Class.** Plaintiff McRitchie seeks to represent a class of similarly situated individuals defined as:

> All persons in the United States who have a Facebook account, have subscribed to The Onion's newsletter, and watched videos on the theonion.com Website using the same browser the person uses to access their Facebook account (the "Class").

44.     Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

45.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiff does not know the exact number of members of the Class. However, given the popularity of Defendant's Website, the number of persons in the Class is believed to be so numerous that joinder of all members is impracticable.

46.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include but are not limited to:

(i)      Whether Defendant collected Plaintiff's and the Class members' PII;

(ii)     Whether Defendant disclosed Plaintiff's and Class members' PII to Meta in violation of the VPPA;

(iii)    Whether Defendant's disclosures were committed knowingly and intentionally; and

(iv)     Whether Defendant disclosed Plaintiff's and Class members' PII without their consent.

47. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, watched pre-recorded videos on the Website, and had his PII and video-viewing information disclosed to third parties.

48. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including VPPA actions. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class. Plaintiff has raised viable statutory claims, or the type reasonably expected to be raised by members of the Class and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

49. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Even if every member of the Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action.

16

**CAUSES OF ACTION**

**COUNT I**
**Violation Of The VPPA**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of Plaintiff and the Class)**

50.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

51.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

52.     Defendant is a "video tape service provider" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), by providing a library of hundreds of videos to consumers via its Website.

53.     Plaintiff and Class members are "consumers" as defined by the VPPA because they subscribed to The Onion's newsletter via the Website.  18 U.S.C. § 2710(a)(1). Specifically, Plaintiff and Class members signed up for The Onion's newsletter by providing their personal information (their email addresses, "IP addresses, and cookies associated with their devices"), in exchange for "receiving periodic [The Onion]-related updates," and having access to the newsletter, thereby making Plaintiff and Class members "subscribers" under the VPPA.  *See Gardner v. Me-TV Nat'l Ltd. P'ship*, 132 F.4th 1022, 1025 (7th Cir. 2025).

54.     Under the VPPA, therefore, Plaintiff Class members are "subscribers" of "goods or services from a video tape service provider."  *See* 18 U.S.C. § 2710(a)(1).

55.     Defendant disclosed to a third party, Meta, Plaintiff's and the Class members' personally identifiable information.  Defendant installed the Meta Pixel on its Website to compel Plaintiff's browsers to transfer their personally identifying information in the form of their Facebook ID, along with event data like the title of the video they viewed, to Meta.

56.     Defendant knowingly disclosed Plaintiff's and Class members' PII because it installed the Meta Pixel on its Website and controlled its functionality, meaning Defendant chose to have the Meta Pixel collect and disclose the URL of the webpage the user visits.

57. Plaintiff and the members of the Class did not provide Defendant with adequate consent—either written or otherwise, "in a form distinct and separate from any form setting forth other legal or financial obligations"[29]—to disclose their PII and event data to third parties.

58. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. Specifically, Defendant's disclosures to Meta were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

59. On behalf of himself and the members of the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of the Plaintiff and the Class by requiring Defendant comply with the VPPA's requirement for protecting a consumer's PII; (3) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (4) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, on behalf of himself and all others similarly situated, as follows:

    (a) For an order certifying the Class pursuant Fed. R. Civ. P. 23, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

    (b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

    (c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

    (d) An award of statutory damages to the extent available;

    (e) For punitive damages, as warranted, in an amount to be determined at trial;

    (f) For prejudgment interest on all amounts awarded; and

    (g) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

---

[29] 18 U.S.C. § 2710(b)(2)(B)(i).

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of any and all issues so triable.

Dated: May 16, 2025

Respectfully submitted,

By: */s/ Philip Fraietta*
    Philip Fraietta

**BURSOR & FISHER, P.A.**
Philip Fraietta
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646)-837-7150
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stefan Bogdanovich *pro hac vice*
*forthcoming*)
Ines Diaz Villafana (*pro hac vice*
*forthcoming*)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email: sbogdanovich@bursor.com
    idiaz@bursor.com

*Attorneys for Plaintiff*